Opinion concurring in the judgment filed by Circuit Judge ROGERS.
Concurring opinion filed by Senior. Circuit Judge EDWARDS.
*967 KAREN LeCRAFT HENDERSON, . Circuit Judge:
Donna M. Coburn, on behalf of herself and all others similarly situated, appeals the district court’s dismissal of her complaint against Evercore Trust Company, N.A, (Evercore) pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) §§ 409, 502(a)(2)-(8), 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3). Coburn, a former J.C. Penney employee and investor in a J.C. Penney employee stock ownership plan (ESOP) managed by Evercore, claims that Evercore breached its fiduciary duties of prudence and loyalty when it failed to take preventative action as the value of J.C. Penney common stock tumbled between 2012 and 2013, thereby causing significant losses. Despite clear factual similarities, Coburn argues that the pleading requirements outlined in Fifth Third Bancorp v. Dudenhoeffer, — U.S. —, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014), are inapplicable to her allegations because she challenges Evercore’s failure to appreciate the riskiness of J.C. Penney stock rather than Evercore’s valuation of its price. We disagree and therefore affirm the district court’s judgment.
I, Background
While Coburn was employed by J.C. Penney, the large retailer offered its employees the opportunity to “save for. their retirement” by investing in the J.C. Penney Savings Profit-Sharing and Stock Ownership Plan (the Plan). Its defined contribution plan was an “employee pension benefit plan” within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an eligible individual account plan within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3). Once an employee opted into the Plan, she could allocate her contribution among a variety of investment options. One of the options was the Penney Stock Fund, an ESOP that consisted largely of J.C. Penney common stock. This was the option Coburn selected.
On December 17, 2009, Evercore became the designated fiduciary and investment manager of the Penney Stock Fund. In this role, Evercore had the authority to restrict or limit the ability of Plan participants to purchase or hold J.C. Penney stock, including the power to “eliminate the [Penney Stock Fund] as an investment option under the Plan and to sell or otherwise dispose of all of the Company Stock held in the [Penney Stock Fund].” Ever-core did not manage any other investment option available, through, the Plan.
In 2011, J.C. Penney attempted to re-conceptualize its brand and hired former Apple, Inc. executive Ron Johnson as its chief executive officer. Distancing himself from J.C. Penney’s historic reliance on sales, coupons and rebates to boost sales, Johnson implemented a more straightforward pricing scheme, reasoning that a “fair and square” pricing policy would attract shoppers. Johnson also reworked both the Company logo and the traditional layout of its stores in an effort to modernize. Taken as a whole, Johnson sought to bring J.C. Penney up to speed with the fads and fashions of 2012, simplifying the business model in order to lower expenses and increase gross. profit margins. This strategy proved to be less than successful.
J.C. Penney’s 2012 first quarter earnings report showed a $163 million loss, or a $0.75 loss per share. Johnson’s poor start was only the beginning, as the, next twenty-one months—from the end of 2012’s first quarter to the end of 2013’s fourth quarter—saw J.C. Penney’s stock price fall from $36.72 to $5.92 per share. As market analysts became increasingly bearish regarding its stock, J.C. Penney cancelled dividends for only the second time since 2006. The disastrous performance led Johnson to a telling realization: the aban *968 doned coupons “were a drug” that “really drove traffic.” Johnson’s tenure ended in April 2013.
Throughout the entire period that the value of J.C. Penney common stock dipped ever lower, Evercore stood resolute. Despite its authority to eliminate the Penney Stock Fund as an investment option in the Plan and its ability to sell shares currently in the Fund, Evercore exercised neither option. The shares in the Penney Stock Fund that Coburn and other investors owned took the full force of the hit. In 2015, Coburn sued on behalf of herself and all others similarly situated, alleging that Evercore was liable for $300 million in losses to the Plan for having breached its fiduciary duty under ERISA §§ 409, 502(a)(2)-(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)—(3).
On February 17, 2016, the district court granted Evercore’s motion to dismiss the complaint for failure to state a claim. Primarily relying on the United States Supreme Court’s opinion in Dudenhoeffer, the district court held that Coburn’s allegations that Evercore should have recognized from publicly available information alone that continued investment in J.C. Penney common stock was “imprudent” were generally implausible absent “special circumstances” affecting the market. Because Coburn failed to plead special circumstances—indeed, Coburn expressly disclaimed any need to plead them—the district court held that Coburn’s complaint could not survive Evercore’s Rule 12(b)(6) challenge. The district court also rejected Coburn’s alternative argument that, pursuant to Tibble v. Edison International, — U.S. —, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015), Evercore violated its fiduciary “duty to monitor” investments and remove imprudent ones. The court reasoned that Tibbie did not affect the Dudenhoeffer holding and thus could not save Coburn’s complaint. Coburn timely filed her notice of appeal.
II. Analysis
We review de novo the dismissal of a complaint for failure to state a claim. Taylor v. Reilly, 685 F.3d 1110, 1113 (D.C. Cir. 2012). The familiar pair of Iqbal and Twombly guide the analysis of a Rule 12(b)(6) imotion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Under that precedent, a complaint must “state a claim to relief that is plausible on its face.” Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). That is, the complaint must include factual allegations that, when taken as true, rise above a “speculative level.” Twombly, 550 U.S. at 555, 127 S.Ct. 1955. It is “a plaintiff’s obligation to provide the grounds of his entitle[ment] to relief [with] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” Id. (first alteration in original) (internal quotation marks omitted).
In Dudenhoeffer, the Supreme Court further refined pleading requirements regarding “allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock.” See Dudenhoeffer, 134 S.Ct. at 2471; accord In re Lehman Bros. Sec. & ERISA Litig., 113 F.Supp.3d 745, 755 (S.D.N.Y. 2015) (noting that Dudenhoeffer “appears to have raised the bar for plaintiffs seeking to bring a claim based on a breach of the duty of prudence” (internal quotation marks omitted) (emphasis removed)), aff’d sub nom. Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 66 (2d Cir. 2016). In Dudenhoeffer, a putative class of employees brought a claim against fiduciaries who *969 oversaw an ESOP, alleging that they had violated the duties of loyalty and prudence imposed by ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109, 1132(a)(2). Dudenhoeffer, 134 S.Ct. at 2464. Specifically, the Dudenhoeffer plaintiffs alleged that the fiduciaries “knew or should have known that [the employer company’s] stock was overvalued and excessively risky,” in part because “publicly available information such as newspaper articles provided early warning signs” of the company’s financial troubles. See id. The Dudenhoeffer fiduciaries, however, “continued to hold and buy” the company’s stocks, a move that ultimately “eliminated a large part of the retirement savings that the participants had invested in the ESOP.” Id.
The Supreme Court affirmed the district court’s dismissal of the complaint, holding that “where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that -the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances.” Id. at 2471. Driving the Dudenhoeffer opinion was the recognition that “investors ... have little hope of outperforming the market in the long run based solely on their analysis of publicly available information, and accordingly they rely on the security’s market price as an unbiased assessment of the security’s value in light of all public information.” Id. at 2471 (internal quotation marks omitted) (quoting Halliburton Co. v. Erica P. John Fund, Inc., — U.S. —, 134 S.Ct. 2398, 2411, 189 L.Ed.2d 339 (2014)). Dudenhoeffer was thus grounded in the efficient capital market theory—the “theory that security prices reflect all available information.” Yesha Yadav, How Algorithmic Trading Undermines Efficiency in Capital Markets, 68 Vand. L. Rev. 1607, 1632 (2015) (citing Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383, 384 (1970)); Appellee’s Br. 11-12. Indeed, according to the efficient capital market theory, a security price in an efficient market “represents the market’s most accurate estimate of the value of a particular security based on its riskiness and the future net income flows that investors holding that security are likely to receive.” Yadav, supra at 1633; accord Basic Inc. v. Levinson, 485 U.S. 224, 246, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (“[T]he market price of shares traded on well-developed markets reflects all publicly available information....”); “Where efficient markets . exist, traders cannot profit by using existing information available in the market, since this news should already be reflected in securities prices.” Yadav, supra at 1633. Instead, a security’s price fluctuates only on the “arrival of new information into the exchange.” Id. (emphasis added). Echoing this theory, Dudenhoeffer agreed that “[a] fiduciary’s ‘failure] to outsmart a presumptively efficient market ..." is ... not a sound basis for imposing liability.’ ” Id. at 2472 (quoting White v. Marshall & Ilsley Corp., 714 F.3d 980, 992 (7th Cir. 2013)).
Thus, because a stock price on an efficient market reflects all publicly available information, Dudenhoeffer requires additional allegations of “special circumstances” when a plaintiff brings a breach of the duty of prudence claim against a fiduciary based on that information. Special circumstances, the Court instructed, includes evidence questioning “the reliability of the market price as an unbiased assessment of the security’s value in light of all public information ... that would make reliance on the market’s valuation imprudent.” Id. (quoting Halliburton Co., 134 S.Ct. at 2411) (internal quotation marks omitted). This evidence may demonstrate that illicit forces (such as fraud, improper accounting, illegal conduct, etc.) were influencing the market, Smith v. *970 Delta Air Lines Inc., 619 Fed.Appx, 874, 876 (11th Cir. 2015) (per curiam), or may otherwise suggest that the market was not efficient and therefore the market price of a security in that market was not necessarily indicative of its underlying, fundamental value.[1] See id. Ultimately, “[Dudenhoeffer] suggested that the special circumstances might include something like available public information tending to suggest that the public market price did not reflect the true value of the shares.” Allen v. GreatBanc Tr. Co., 835 F.3d 670, 679 (7th Cir. 2016).
Applying Dudenhoeffer here, we believe Coburn’s claim falls far short. Despite the Supreme Court’s instruction that claims of imprudence based on publicly available information must be accompanied by allegations of “special circumstances,” Coburn acknowledges that she “did not allege the market on which J.C. Penney stock traded was inefficient....” Appellant’s Br. 21. Quite clearly, then, if Dudenhoeffer controls, Coburn’s complaint was properly dismissed,[2] Dudenhoeffer, 134 S.Ct. at 2471.
Perhaps recognizing the inadequacy of her claim under Dudenhoeffer, Co-burn instead attempts to distinguish Dudenhoeffer, arguing that the additional pleading requirements set forth therein are inapplicable to her allegations. Appellant’s Br. 11-12, 19-20. Coburn insists that her claim is not that Evercore over- or undervalued J.C. Penney stock but instéad that Evercore exposed her to “outsized and unnecessary retirement savings risk” by failing to act as J.C. Penney stock value dipped ever lower. Id. at 11. This risk exposure, according to Coburn, was especially egregious given that the purpose of the Penney Stock. Fund, was to help employees like Coburn prepare for retirement—Evercore should have recognized its investors’ low risk tolerance. Id. at, 19-20. In a nutshell, then, Coburn argues that Evercore was imprudent for continuing to hold J.C. Penney common stock when it became increasingly and excessively risky—a claim that should fall under Iqbal/Twombly instead of Dudenhoeffer.
*971 We disagree.[3] For one, the plaintiffs in Dudmhoeffer itself made the same argument, specifically claiming that the fiduciaries there should have known that the company stock was both “overvalued and excessively risky.” Dudenhoeffer, 134 S.Ct. at 2464 (emphasis added). Without preamble, the Supreme Court disposed of the risk-based claims through its broad rule that “allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule.” Id. at 2471. If the Supreme Court had no difficulty in using its value-centric rule to dismiss a risk-based claim by plaintiffs with similar risk tolerance, we have no license to deviate therefrom here. See id.) Rinehart, 817 F.3d at 66 (“Although the language of [Dudenhoejfer] refers primarily to ‘over- or undervaluing’ stock, the ... Court applied [the heightened pleading] rule to the plaintiffs’ risk-based claims in that case,”).
Additionally, well-reasoned decisions by our sister circuits have also determined that risk-based claims must nonetheless meet Dudenhoeffer’s pleading requirement to survive a motion to dismiss. For example, in no uncertain terms, the Second Circuit held that “the purported distinction between' claims involving ‘excessive risk’ and claims involving ‘market value’ is illusory.” Rinehart, 817 F.3d at 66. The Rinehart court agreed that Dudenhoeffer “foreclose[d] breach of prudence claims based on public information irrespective of whether such claims are characterized as based on alleged overvaluation or alleged riskiness of a stock.” Id. (emphases and internal quotation marks omitted) (quoting In re Lehman Bros. Sec. & ERISA Litig., 113 F.Supp.3d at 756). The Sixth Circuit also followed this approach in Pfeil v. State Street. Bank and Trust Co., where it reiterated that the “excessively risky character of investing ESOP funds in stock of a company experiencing serious threats to its business ... is accounted for in the market price,' and the Supreme Court held that fiduciaries may rely on the market price, absent any special circumstances affecting the reliability of the market price.” 806 F.3d 377, 386 (6th Cir. 2015) (internal quotation marks omitted) (quoting In re Citigroup ERISA Litig., 104 F.Supp.3d 599, 615 (S.D.N.Y. 2015)); accord Smith, 619 Fed.Appx. at 876 (complaint must plead “special circumstances” whenever alleged breach stems from fiduciary’s failure to act on public information).
Rinehart and Pfeil—like Dudenhoeffer—are grounded- in the efficient capital *972 market theory. See Rinehart, 817 F.3d at 65-66; Pfeil, 806 F.3d at 386. In fact, Rinehart declares that “viewing [Dudenhoeffer’s] rule as applicable to all allegations of imprudence based upon public information—regardless of whether the allegations are framed in terms of market value or excessive risk—is consistent with the efficient market hypothesis that risk is accounted for in the market price of a security.” Rinehart, 817 F.3d at 66; accord Pfeil, 806 F.3d at 386 (noting that related Modern Portfolio Theory “rests on the understanding that organized securities markets are so efficient at discounting securities prices that the current market price of a security is highly likely already to impound the information that is known or knowable about the future prospects of that security” (quoting John H. Langbein et al., Pension and Employee Benefit Law 634 (5th ed. 2010))); Yadav, supra at 1633 (in efficient market, market’s most accurate estimate of particular security’s value is based on its riskiness ' and future net income flows investors holding that security are likely to receive). We likewise reject Coburn’s claim that risk is attenuated, from price such that risk-based allegations are totally free from Dudenhoeffer’s constraints.[4] See Dudenhoeffer, 134 S.Ct. at 2471. Because a stock price fluctuates, in part, to achieve “the same risk-adjusted expected return as the stocks of the strongest companies,” Cent. Nat’l Bank of Mattoon v. U.S. Dep’t of Treasury, 912 F.2d 897, 901 (7th Cir. 1990), arguing that a stock is too risky to hold at current market prices is part and parcel of the claim that that stock is overvalued,[5] see Dudenhoeffer, 134 S.Ct. at 2471.
*973 For the foregoing reasons, the judgment of the district court is affirmed.[6]

So ordered.

. "An inefficient market, by definition, does not incorporate into its price all the available information about the value of a security.” ' Freeman v. Laventhol & Horwath, 915 F.2d 193, 198 (6th Cir. 1990). In an inefficient market, it is plausible that a fiduciary could act imprudently by not acting on publicly available information because there is less assurance that that information has already been' incorporated into the security price. Cf. Dudenhoeffer, 134 S.Ct. at 2471. "[M]arket efficiency is a matter of degree and accordingly .., a matter of proof.” Halliburton Co., 134 S.Ct. at 2410. The degree to which a market must be inefficient to meet the “special circumstances” bar need not be decided here—we leave that question for another day.

. In district court, Cobum also argued that Evercore violated a continuing duty to monitor investments as set forth in Tibbie, 135 S.Ct. at 1828. Whereas Dudenhoeffer primarily focuses on allegations of misvaluation in the marketplace, see 134 S.Ct. at 2471, Tibbie focuses on the prudence of holding particular investments over time, requiring a fiduciary “to conduct a regular review of its investment with the nature and timing .of the review contingent on the circumstances.” 135 S.Ct. at 1827-28. It is conceivable, then, that publicly available information that is insufficient to allege a plausible claim against a fiduciary under Dudenhoeffer would nonetheless be sufficient to survive a motion to dismiss under Tibbie if the fiduciary failed to “conduct a regular review” of its investment in light of that publicly available information. See id. And indeed, Coburn’s allegations—that Ever-core "failed to engage in proper monitoring of the [Penney] Stock Fund,” Joint Appendix 20—would perhaps be sufficient to survive a motion to dismiss under Tibbie. Coburn failed, however, to make this argument on appeal—indeed, Coburn does not cite Tibbie once in her brief—and the argument is therefore forfeited. Am. Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C. Cir. 2008) (issues not raised in opening brief are forfeited on appeal).

. The factual premise on which Coburn’s argument rests is itself faulty, Although we have previously recognized as a central pillar of financial analysis that "past trend[s] can often be accepted as a dependable index of the future,” Am. Airlines, Inc. v. Civil Aeronautics Bd„ 192 F,2d 417, 421 (D.C. Cir. 1951), this acknowledgement is a far cry from the proposition that past market trends will always continue into the future. If the latter proposition were true, any investor with an elementary understanding of a put option would be exceedingly wealthy after having shorted J.C. Penney stock in 2012, the beginning of the ■ class period. Instead, at any given point, a security’s risk of loss is counterbalanced by the possibility of gain and a stock price re-fleets, inter alia, the market's equilibrium point between those competing forces. See Cent. Nat’l Bank of Mattoon v. 'U.S. Dep't of Treasury, 912 F.2d 897, 901 (7th Cir. 1990) ("The prices of the stocks of weak companies are bid down in the market until those stocks yield the same risk-adjusted expected return as the stocks of the strongest companies; otherwise no one would hold stock in a weak company—the prices of such stock would fall to zero.”). To the extent Coburn argues that Evercore knew that J.C. Penney stock was .certain to suffer future losses because of past poor performance, see Appellant’s Br.-8 ("Ev-ercore Saw It Coming”), we reject that claim as implausible.

. Coburn herself provides ample evidence of the connection between risk and value as, throughout her brief, she argues the risky nature of J.C. Penney stock by highlighting past declines in the price of the security. Appellant’s Br. 18 ("Even with ever decreasing stock price value caused by the Company's continually bad financial performance, Ever-core stood on the deck of the sinking ship of J.C. Penney and did precisely nothing to protect the assets of the Plan and its partici-pants_" (emphasis added)); Appellant’s Br. 21-22 (“Evercore should have discontinued investment in J.C. Penney stock precisely because the steady decline of the Company's stock price 'accurately tracked the company’s steadily worsening fortunes.’ ” (emphasis added)).

. Coburn's attempt to bypass this reality is unpersuasive. As noted above, stock prices fluctuate to achieve the same expected return as the stocks of the strongest companies in the market. Cent. Nat’l Bank of Mattoon, 912 F.2d at 901. This means that, inter alia, a "risk discount” is applied to stocks of weaker companies—when a stock becomes increasingly risky (and hence,- its potential for loss increases), its price falls so as to maintain the expected market rate of return. See id. Here, however, Coburn argues that Evercore could not rely on the market to apply an appropri-
ate “risk discount” because Penney Stock Fund investors had a lower risk tolerance .than average market investors. See Appellant’s Br. 19-21. The investors therefore demanded a greater risk discount than the one applied by the market at large and Evercore should have recognized that the market price of J.C. Penney stock constituted an imprudent investment if this more conservative risk discount were applied. See id.
Coburn's argument fails, however, because she mischaracterizes the risk tolerance of ESOP investors. "Congress, in seeking to permit and promote ESOPs, was pursuing pur- , poses other than the financial security of plan participants.” Dudenhoeffer, 134 S.Ct. at 2467-68. Although the alternative purposes are insufficient to create a presumption of prudence on the part of an ESOP fiduciary, id. at 2470-71, they nonetheless reflect a clear reality:
Whatever evils [that exist in ESOPs] are endemic to the ESOP form established by Congress, A benefit of employees investing in their employer is that when the employer does well, the employees do well. A risk is that when the employer goes bankrupt, the employees do poorly.
Pfeil, 806 F.3d at 387. Undiversified ESOPs are thus not fairly characterized as "low-risk” investments because of their direct relationship to the fortunes of a single company, Cf. *973 Terrence R. Chorvat, Ambiguity and Income Taxation, 23 Cardozo L. Rev. 617, 630 (2002) (citing Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance 153-56 (1996)) (elementary principle of finance instructs "ceteris paribus, a diversified portfolio of investments has less risk than an undiversified portfolio of stocks”). We therefore reject the premise of Coburn’s claim that Evercore should have considered its investors as low risk (i.e., that Evercore should have applied an above-market risk discount) when assessing the prudence of continued investment in J.C, Penney common stock. This conclusion is in accord with Dudenhoeffer itself, which—as noted above—rejected the risk-based claims of ESOP investors with a similar risk tolerance. See supra at 971-72.

. Because we conclude that Dudenhoeffer applies to Coburn’s claim, we need not reach the question whether, absent Dudenhoeffer, Coburn was nonetheless required to allege that J.C. Penney was “no longer viable” in order to survive dismissal. See Appellant's Br. 22-23.