RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PAUL SAUMER; WALTER A. SKALSKY, individually and
on behalf of all others similarly situated,

> *Plaintiffs-Appellants*,

*v.*

CLIFFS NATURAL RESOURCES INC., et al.,

> *Defendants-Appellees*.

No. 16-3449

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cv-00954—Dan A. Polster, District Judge.

Decided and Filed:  April 7, 2017

Before:  MERRITT, COOK, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Edward W. Ciolko, Mark K. Gyandoh, Julie Siebert-Johnson, KESSLER TOPAZ
MELTZER & CHECK, LLP, Radnor, Pennsylvania, for Appellants.  John M. Newman,
Geoffrey J. Ritts, Adrienne Ferraro Mueller, Emmett E. Robinson, JONES DAY, Cleveland,
Ohio, for Appellees.

_____

### OPINION

_____

COOK, Circuit Judge.  The Employee Retirement Income Security Act ("ERISA")
regulates employer-administered retirement plans.  To safeguard employees' retirement assets,
ERISA requires plan fiduciaries to, among other things, manage plan assets prudently and
diversify investments "so as to minimize the risk of large losses."  29 U.S.C. § 1104(a)(1).  For

the past forty years, however, ERISA has also encouraged employee ownership of employer stock. To promote this goal, ERISA permits companies to offer an Employee Stock Ownership Plan ("ESOP")—a retirement option designed to invest primarily in employer stock. *Id.* § 1107(d)(6)(A). Because ESOPs are, by definition, not prudently diversified, Congress fashioned an exemption to these core fiduciary duties: "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) of [§ 1104(a)(1) are] not violated by acquisition or holding of [employer stock]." *Id*. § 1104(a)(2).

This case requires us to reconcile ERISA's requirement that a fiduciary act prudently with its blessing of undiversified ESOPs.

I.

Cliffs Natural Resources ("Cliffs") is a publicly traded iron-ore and coal-mining company. Cliffs's business depends on the price of iron ore, which in turn depends on Chinese economic growth. In 2011, Chinese construction projects drove iron-ore prices to all-time highs. Betting on continued high prices, Cliffs financed the purchase of a mine located in Northern Quebec ("Bloom Lake Mine"). Projecting that the mine would increase cash-flow, Cliffs upped its stock dividend to double the S&P 500 average.

In 2012, a global demand slump halved the price of iron ore, cutting deeply into Cliffs's revenue. The Bloom Lake Mine quickly turned from the company's lifeblood to, in the words of Cliffs's CEO, "the cancer that we have to take out." The mine's costs exceeded predictions, often by significant margins. And the company's decreased revenue and high costs exacerbated its financial weakness. The market responded: in 2013, Cliffs stock performed worse than any other company in the S&P 500. All told, Cliffs lost 95% of its value between 2011 and 2015 (compared to a roughly 50% gain for the broader market during the same period).

Plaintiffs are Cliffs employees who participated in the company's defined-contribution plan, commonly known as a 401(k). The plan allowed participants to invest in twenty-eight mutual funds, including an array of target-date, stock, and bond funds. The plan also offered an ESOP that invested solely in Cliffs stock. Employees enjoyed discretion about whether to invest

their income and matching contributions in the ESOP. If the employee failed to choose an investment option, the fiduciary directed contributions into a money-market fund.

After Cliffs stock cratered, plaintiffs filed a class action claiming that the plan's fiduciaries—investment-committee members and corporate officers—imprudently retained Cliffs stock as an investment option. In particular, plaintiffs allege that it was imprudent to continue investing in Cliffs stock because 1) the company's "risk profile and business prospects dramatically changed from when the investment was introduced . . . due to . . . the collapse of iron ore and coal prices" and Cliffs's deteriorating financial condition, and 2) the fiduciaries possessed inside information showing that the stock was overvalued.

The defendants filed a motion to dismiss, which the district court granted. For the following reasons, we AFFIRM.

## II.

We review de novo the district court's dismissal of a complaint for failure to state a claim. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010) (citations omitted). We "accept all well-pleaded factual allegations as true and construe the complaint in the light most favorable to plaintiffs." *Id.* (citation omitted). To survive a motion to dismiss, the complaint must include sufficient factual allegations to state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.

Courts have struggled to define a fiduciary's duties when administering an ESOP. To understand why, one must grasp the "efficient market hypothesis" and the importance of diversification to prudent portfolio construction.

The efficient market hypothesis posits that "a stock price on an efficient market reflects all publicly available information." *Coburn v. Evercore Trust Co.*, 844 F.3d 965, 969 (D.C. Cir. 2016). According to the theory, "a security price in an efficient market 'represents the market's most accurate estimate of the value of a particular security based on its'" risk profile and expected future earnings. *Id.* (quoting Yesha Yadav, *How Algorithmic Trading Undermines*

*Efficiency in Capital Markets*, 68 Vand. L. Rev. 1607, 1633 (2015)).  Fiduciaries may therefore rely on a "security's market price as an unbiased assessment of the security's value in light of all public information."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2411 (2014)).

Because *new* information and changing circumstances can alter the market's assessment of a company's value—and cause extreme fluctuations in a security's price—ERISA requires fiduciaries to diversify their investments.  *See* 29 U.S.C. § 1104(a)(1).  By purchasing multiple securities, fiduciaries can mitigate company- and industry-specific risks.  *See Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 409 (7th Cir. 2006).  Furthermore, by investing in multiple asset classes (real estate, domestic stocks, foreign stocks, bonds) that respond differently to market-wide economic events—such as recessions, wars, or elections—a fiduciary can craft a portfolio with an acceptable expected rate of return and limited volatility.  *See* Restatement (Third) of Trusts § 90 cmt. g (Am. Law Inst. 2007).

An investor's decision to eschew diversification and instead invest in only a single stock can be calamitous.  Many blue-chip companies—Eastman Kodak, Lehman Brothers, General Motors, Enron, Delta Airlines, to name a few—have declared bankruptcy, resulting in staggering losses to shareholders.  Many other well-known companies have suffered losses in excess of 80%, far worse than the losses that the overall market suffered during the Great Recession. (American Express, Amazon, Starbucks, Texas Instruments, Intel, Time Warner, Celgene, Cooper Tire, International Paper, JC Penney, General Electric, among many others, have suffered such losses since the turn of the century.)  Among smaller companies, huge losses are even more common.  For retirees regularly withdrawing money from their investments, such downturns—even if the stock's price eventually recovers—are financially devastating.

Because ESOPs invest primarily in a single stock, they expose participants to the risks inherent in an undiversified portfolio.  And by investing primarily in their employer, participants take on even greater risk because their other sources of security—their income, health insurance, and if the company is a large regional employer, their home value—are intertwined with the employer's health.

Congress's imposition of strict prudential standards is therefore in tension with its blessing of undiversified ESOPs. On the one hand, the "central feature" of prudence is the reduction of risk through diversification, Restatement (Third) of Trusts § 90 cmt. g; on the other hand, investing primarily in one's employer exposes retirees to excessive company-specific risk.

IV.

Plaintiffs first contend that publicly available information revealed Cliffs's declining revenues, high operating costs, and unmanageable debt. Thus, plaintiffs argue that the fiduciary's decision to invest in "Cliffs stock was imprudent . . . because its risk profile and business prospects dramatically" deteriorated during the class period. According to plaintiffs, even if the market accurately priced Cliffs stock, the company's "risk profile exceeded the reasonable bounds for a retirement option within a plan meant for retirement savings."

*The Moench Presumption.* In evaluating these types of claims, several courts, including the Sixth Circuit, reconciled ERISA's prudence requirement with its approval of ESOPs by applying a now-defunct presumption: "an ESOP fiduciary who invests the [retirement] assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision," *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995), *abrogated by Dudenhoeffer*, 134 S. Ct. at 2467, unless the "company faced 'impending collapse' or 'dire circumstances' that could not have been foreseen by the founder of the plan," *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 989 (7th Cir. 2013) (collecting cases), *abrogated by Dudenhoeffer*, 134 S. Ct. at 2467. When circumstances present "unusually severe financial risks to participants," the fiduciary must ignore the ESOP-plan instructions and diversify the plan's holdings. *Id.* at 990 (citing *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003)); *see also Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) (adopting the *Moench* presumption), *abrogated by Dudenhoeffer*, 134 S. Ct. at 2467.

*The Moench Presumption's Shortcomings.* The *Moench* presumption failed to solve ERISA's inherent contradiction—after all, a portfolio consisting of a single stock is always excessively risky, even if the company isn't facing impending collapse. The presumption also proved unworkable because neither courts nor fiduciaries knew how far a company's financial

position needed to deteriorate before the fiduciary must diversify ESOP assets. As Judge Posner put it, "determining the 'right' point, or even range of 'right' points, for an ESOP fiduciary to break the plan and start diversifying may be beyond the practical capacity of the courts to determine." *Summers*, 453 F.3d at 411.

Even if a fiduciary divests a distressed company's stock, such action may not help plan participants. By the time the fiduciary perceives the danger, it's likely too late: the market has already digested any new negative information and tanked the stock's price, and the fiduciary would simply be selling low. Furthermore, a fiduciary's decision to eliminate company stock "is a clarion call to the investment world that the [fiduciary] lacked confidence in the value of its stock, and could have a catastrophic effect on [the] stock price," severely harming plan members. *In re Comput. Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1136 (C.D. Cal. 2009).

Finally, fiduciaries deciding whether to maintain company stock as an investment option face a dilemma: if they continue investing in the employer and the stock goes down, plan participants might sue them for acting imprudently, in violation of § 1104(a)(1)(B); if they sell the company stock and the company recovers, plan participants might sue them for disobeying plan documents, in violation of § 1104(a)(1)(D). *See Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008).

*Dudenhoeffer.* Against this backdrop, the Supreme Court decided *Fifth Third Bancorp v. Dudenhoeffer*, a stock-drop case similar to the case here. The plaintiffs, Fifth-Third Bank employees, invested heavily in the company's stock through an ESOP. *Dudenhoeffer*, 134 S. Ct. at 2464. During the 2008-09 financial collapse, Fifth Third Bank's stock plummeted, losing most of its value. *Id.* Plaintiffs sued, claiming that the Bank's risk profile—its balance sheet included substantial subprime mortgages—made the company an imprudent investment. *Id.*

Relying on ERISA's plain language, the Court scrapped the presumption of prudence, explaining that "ESOP fiduciaries are subject to the duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets." *Id.* at 2463. The Court also held, however, that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or

undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Id.* at 2471. Thus, ERISA fiduciaries may "prudently rely on the market price" when determining whether to offer company stock. *Id.*

*Post-Dudenhoeffer Cases.* Although the Court discarded the presumption of prudence, "*Dudenhoeffer* appears to have *raised* the bar for plaintiffs seeking to bring a claim based on a breach of the duty of prudence." *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 755 (S.D.N.Y. 2015). Because a fiduciary may prudently rely on a stock's market price, *Dudenhoeffer* "effectively immunizes fiduciaries from imprudence claims relating to publicly traded securities in the absence of special circumstances." *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015) (White, J., dissenting).

To illustrate, in *Pfeil*, the plaintiffs argued that ESOP fiduciaries imprudently offered General Motors stock as a retirement option even though "overwhelming evidence in the public domain rais[ed] serious question[s] concerning GM's short-term viability." *Id.* at 383. We held that the plaintiffs' risk-based claim failed, reasoning "that the 'excessively risky' character of investing ESOP funds in stock of a company experiencing serious threats to its business in 2008 'is accounted for in the market price, and the Supreme Court held that fiduciaries may rely on the market price, absent any special circumstances affecting the reliability of the market price.'" *Id.* at 386 (quoting *In re Citigroup*, 104 F. Supp. 3d 599, 615 (S.D.N.Y. 2015)). Although we acknowledged that ESOPs expose retirees to great risk, such "evils . . . are endemic to the ESOP form established by Congress. A benefit of employees investing in their employer is that when the employer does well, the employees do well. A risk is that when the employer goes bankrupt, the employees do poorly." *Id.* at 387.

Similarly, in *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56 (2d Cir. 2016), plaintiffs alleged that the fiduciary imprudently invested ESOP assets solely in Lehman Brothers. The plaintiffs argued that even if the market accurately priced the stock, the company was nonetheless excessively risky. *Id.* at 64–65. The court held that the fiduciary's reliance on Lehman's market price shielded it from "*all* allegations of imprudence based upon public information." *Id.* at 66. "[R]egardless of whether the allegations are framed in terms of market value or excessive risk," the fiduciary could assume that the market price accurately reflected the

security's value. *Id.*; *see also Coburn*, 844 F.3d at 971 (dismissing employees' claim that JC Penney's stock was excessively risky to be a sole holding, and explaining that any "risk is accounted for in the market price of a security" (quoting *Rinehart*, 817 F.3d at 66)).

*Application.* Applying *Dudenhoeffer*, we reject plaintiffs' argument that Cliffs's risk profile "exceeded the reasonable bounds for a retirement option." *Dudenhoeffer* plainly holds that a fiduciary may rely on market price as an unbiased assessment of a security's value. Plaintiffs attempt to sidestep *Dudenhoeffer*, arguing that although the Court foreclosed claims alleging that a fiduciary failed to perceive a company's overvaluation, the Court didn't foreclose "classic ERISA . . . imprudence action[s]."

Plaintiffs' argument misses the mark. The plaintiffs in *Dudenhoeffer* similarly argued that the fiduciary should have known that the company's stock was "overvalued *and excessively risky*." 134 S. Ct. at 2464 (emphasis added). The Court's market-price-reliance rule dispatched both the value- and risk-based claims. *Id.* at 2471–72. Furthermore, *Pfeil*, *Rinehart*, and *Coburn* all hold that *Dudenhoeffer* "foreclose[d] breach of prudence claims based on public information irrespective of whether such claims are characterized as based on alleged overvaluation or alleged riskiness of a stock." *Coburn*, 844 F.3d at 971 (alteration in original) (quoting *Rinehart*, 817 F.3d at 66); *Pfeil*, 806 F.3d at 386.

In addition, *every* company carries significant risk that unpredictable developments— such as the collapse of iron-ore prices—will devastate its prospects (and stock price). Although fiduciaries normally mitigate company- and industry-specific risks by diversifying plan assets, *see* Restatement (Third) of Trusts § 90(b), Congress explicitly approved concentrating assets in employer stock, *see* 29 U.S.C. § 1107(d)(6)(A). That changing conditions might undercut a company's stock price and eviscerate employees' retirement funds is simply "endemic to the ESOP form established by Congress." *Pfeil*, 806 F.3d at 387.

V.

As explained, *Dudenhoeffer* held that, absent "special circumstances," a fiduciary "is not imprudent to assume that a major stock market provides the best estimate of the value of the stocks traded on it." 134 S. Ct. at 2471 (internal alteration omitted) (quoting *Summers*, 453 F.3d

at 408). Plaintiffs allege that the fiduciaries' failure "to engage in a reasoned decision-making process regarding the prudence of Cliffs Stock" constituted a "special circumstance" rendering reliance on the market price imprudent. The district court rejected plaintiffs' argument, reasoning that the only way to plead "special circumstances" was to show Cliffs traded on an inefficient market.

In *Pfeil*, we left open whether a fiduciary's failure to investigate the merits of investing in a publicly traded company counts as a "special circumstance." 806 F.3d at 386. We now conclude that even if the special-circumstances exception encompasses more than market inefficiency, it doesn't include a fiduciary's failure to independently verify the accuracy of the market's pricing.

*Dudenhoeffer* dictates our conclusion. The Court stated that fiduciaries may prudently "assume" that stock markets provide the best estimate of a security's value. *Dudenhoeffer*, 134 S. Ct. at 2471 (quoting *Summers*, 453 F.3d at 408). Accepting that the Court meant what it said, an ESOP fiduciary may take for granted that the security's market price reflects the company's value.

Furthermore, *Dudenhoeffer* reasoned that an investor's inquiry into a publicly traded company is unlikely to reveal the company's "true" value, much less the future course of its stock price. As the Court explained, "[m]any investors take the view that 'they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information,' and accordingly they 'rely on the security's market price as an unbiased assessment of the security's value in light of all public information.'" *Dudenhoeffer*, 134 S. Ct. at 2471 (quoting *Halliburton Co.*, 134 S. Ct. at 2411). And because ERISA fiduciaries "likewise could reasonably see 'little hope of outperforming the market . . . based solely on their analysis of publicly available information,' [they] may, as a general matter, likewise prudently rely on the market price." *Id.* (alteration in original) (quoting *Halliburton*, 134 S. Ct. at 2411). *Dudenhoeffer*'s reasoning thus supports the conclusion that a fiduciary's failure to investigate the accuracy of a publicly traded employer's stock price is not a "special circumstance."

In any event, although a fiduciary generally must investigate an investment's merits, "a fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable." *Kuper*, 66 F.3d at 1459. Rather, "to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan." *Id.* (alterations omitted). Here, plaintiffs have not pled what, if anything, the fiduciaries might've gleaned from publicly available information that would undermine reliance on the market price.

VI.

Plaintiffs alternatively allege that the fiduciaries knew the Bloom Lake Mine would not deliver the promised profits. By withholding that information from the market, plaintiffs argue, the fiduciaries artificially inflated Cliffs's stock price. The complaint alleges that the fiduciaries should have used their inside information to prevent ESOP losses by 1) divulging inside information about the mine so that the market would correct downward and the fiduciary would cease buying Cliffs stock at an inflated price, 2) directing that new "contributions to the Company Stock fund be held in cash," or 3) "clos[ing] the Company Stock itself to further contributions and direct[ing] that contributions be diverted from Company Stock into other (prudent) investment options."

*Supreme Court Precedent.* In *Dudenhoeffer*, the Court explained that "[t]o state a claim for breach of the duty of prudence on the basis of inside information," a plaintiff must put forth "an alternative action . . . that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." 134 S. Ct. at 2472. And when the plaintiff alleges that the fiduciary should have closed the fund or divulged insider information, the court must

> consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the

stock price and a concomitant drop in the value of the stock already held by the fund.

*Id.* at 2473.

In *Amgen, Inc. v. Harris*, 136 S. Ct. 758 (2016) (per curiam), plaintiffs "allege[d] that Amgen, a large pharmaceutical company, concealed the negative results of a clinical trial for an anemia drug and also marketed a risky off-label use for that drug." *Harris v. Amgen, Inc.*, 788 F.3d 916, 924 (9th Cir. 2014) (Kozinski, J., dissenting from denial of reh'g en banc), *rev'd by Amgen*, 236 S. Ct. at 760.[1]  After the company disclosed the trial results, Amgen's stock plummeted.  Employees who invested in Amgen's ESOP sued the fiduciaries, claiming that they "should have either removed the Amgen stock as an investment option or revealed to the general public the test results and the alleged riskiness of the off-label use." *Id.*  The Ninth Circuit agreed, reasoning that the complaint plausibly alleged that the fiduciaries should have disclosed nonpublic information or removed the fund as an investment option. *Id.* at 935–39 (majority opinion).  The Supreme Court issued a per curiam reversal, reasoning that the complaint failed to allege facts showing that the proposed "alternative action[s] . . . could plausibly have satisfied [*Dudenhoeffer*'s] standards." *Amgen*, 136 S. Ct. at 760.  Neither *Amgen* nor *Dudenhoeffer* articulate what factors lower courts should evaluate when determining if a complaint satisfies this standard.

*Appellate Court Precedent*.  Few appellate courts have applied *Dudenhoeffer*'s alternative-action pleading requirement.  In *Rinehart*, the Second Circuit held that a "prudent fiduciary could have concluded that divesting Lehman stock, or simply holding it without purchasing more, 'would do more harm than good.'" 817 F.3d at 68 (quoting *Amgen*, 136 S. Ct. at 760).  The court reasoned, without further analysis, that "[s]uch an alternative action in the summer of 2008 could have had dire consequences." *Id.*

Similarly, in *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016), the plaintiffs alleged that the fiduciaries, BP corporate officers, knew BP stock was "overpriced because BP had a greater risk exposure to potential accidents than was known to the market." *Id.* at 529.  When the Deepwater Horizon explosion revealed BP's safety defects and cratered the company's stock,

---

[1]We cite to the lower court opinion because the Supreme Court's per curiam order omits background facts.

ESOP participants sued.  In dismissing the complaint, the court explained that "the plaintiff bears the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it."  *Id.*  Because the proposed alternative actions—disclosure of the safety defects and freezing BP stock purchases—"would likely lower the stock price . . . it seems that a prudent fiduciary could very easily conclude that such actions *would* do more harm than good."  *Id.*

*Our Application.*  We reject plaintiffs' nonpublic-information claim.  Plaintiffs offer the same alternative actions—disclosing inside information and stopping additional ESOP contributions—that *Amgen*, *Whitley*, and *Rinehart* reject.  Here, too, the complaint fails to plausibly allege that a "prudent fiduciary . . . could not have concluded that stopping purchases . . . or publicly disclosing negative information would do more harm than good." *Dudenhoeffer*, 134 S. Ct. at 2473.  Cliffs's fiduciaries could have concluded that divulging inside information about the Bloom Lake Mine would have collapsed Cliffs's stock price, hurting participants already invested in the ESOP.  And closing the fund without explanation might be even worse: "It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value." *Amgen*, 788 F.3d at 925–26 (Kozinski, J., dissenting from denial of reh'g en banc).

Plaintiffs say not so fast:  *Amgen* noted that removing a fund as an investment option might satisfy the *Dudenhoeffer* standard, so long as the complaint includes sufficient supporting facts.  *Amgen*'s analysis, however, neglects to offer any guidance about what facts a plaintiff must plead to state a plausible claim for relief.  And our sister circuits have tersely rejected similar claims.  *See Whitley*, 838 F.3d at 529; *Rinehart*, 817 F.3d at 68.  Accepting that there might be "exceptional circumstances where such extreme action is compelled by ERISA," *Amgen*, 788 F.3d at 926 (Kozinski, J., dissenting from denial of reh'g en banc), we nonetheless find plaintiffs' complaint inadequate here.

Plaintiffs point to two allegations in the complaint supporting their argument that "no fiduciary in the same position as the Defendants could conclude that freezing or liquidating Company Stock would do more harm than good."

- "Rather than do nothing (as they did), Defendants could have taken numerous steps to fulfill their fiduciary duties to the Plan under ERISA. As set forth more fully below, none of these steps (a) would have violated securities laws or any other laws, or (b) would [] have been more likely to harm the Company Stock Fund than to help it."

- "Given the relatively small number of Cliffs shares that might not have been purchased by the Cliffs stock fund in comparison to the enormous volume of actively traded shares, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the Cliffs share price."

Neither allegation suffices. The first is a conclusion that we need not assume to be true. *See Iqbal*, 556 U.S. at 679. The second is non-responsive to the Court's twin concerns: that ceasing purchases might indicate to the market "that insider fiduciaries viewed the employer's stock as a bad investment," and that divulging negative information might cause the stock to drop, hurting plan participants. *Dudenhoeffer*, 134 S. Ct. at 2473.

Accordingly, we reject plaintiffs' nonpublic-information claims.[2]

## VII.

Plaintiffs also argue that 1) the fiduciaries breached their duty of loyalty to plan members and that 2) corporate officers (who are also ERISA fiduciaries) failed to monitor the investment committee or provide them with information. For the reasons stated by the district court, we reject plaintiffs' arguments. Plaintiffs also contend that the district court abused its discretion when it denied their motion for relief from judgment and motion for discovery. Because the district court correctly dismissed the complaint, and because plaintiffs failed to explain why they waited until after the district court entered judgment to request discovery, we discern no error.

---

[2]Plaintiffs' two other counterarguments warrant only brief mention. They first argue that the Department of Labor and the Securities and Exchange Commission filed amicus briefs in *Whitley* that support plaintiffs' position. But neither agency filed an amicus brief articulating their positions in this case. And, in any event, the Fifth Circuit rejected the agencies' position and dismissed the employees' complaint. *Whitley*, 838 F.3d at 529.

Plaintiffs also note that the district court denied a motion to dismiss in a related securities fraud claim. But "alleged securities law violations do not necessarily trigger a valid ERISA claim." *Jander v. Int'l Bus. Mach. Corp.*, 205 F. Supp. 3d 538, 546, (S.D.N.Y. 2016) (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d at 768–69). Finally, we never evaluated the merits of the securities fraud claim against Cliffs's executives because the parties settled—the parallel securities litigation is thus unhelpful.

VIII.

In the Tax Reform Act of 1976, Congress "made clear its interest in encouraging [ESOPs] as a bold and innovative method of strengthening the free private enterprise system which will solve the dual problems of securing capital growth and of bringing about stock ownership by all corporate employees." *Dudenhoeffer*, 134 S. Ct. at 2465–66 (quoting Tax Reform Act of 1976, § 803(h), 90 Stat. 1590). To promote these benefits, Congress has repeatedly enacted laws encouraging employers to offer ESOPs as a retirement option. *See, e.g.*, 29 U.S.C. § 1107(b) (exempting ESOPs from the generally applicable 10% limit on the portion of plan assets that may be invested in employer stock); 26 U.S.C. § 404(k) (allowing companies to deduct dividends on employer stock held in an ESOP); *id.* § 1042 (deferring taxation of taxable gains from stock sold to an ESOP).

Regardless of the merits of employee stock ownership, the lack of safeguards ensuring employees diversify their assets frequently begets financial ruin. Because competition and changing circumstances will inevitably devastate some companies' prospects, hapless employees will continue to lose their jobs, their benefits, and their retirement savings, often in one fell swoop. Any policy change to protect employees, however, must come from Congress, not the courts.

For the foregoing reasons, we AFFIRM the district court's judgment.