NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0016n.06

**FILED**
Jan 08, 2018
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TODD GRAHAM, PAUL JOHNSON, RUSS POPTANYCZ, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| RICHARD FEARON, KEN D. SEMELSBERGER, TRENT MEYERHOEFER, MARK MCGUIRE, | ) ) ) | |
| Defendants-Appellees. | ) ) | |

**BEFORE: SILER, WHITE and THAPAR, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiffs-Appellants Todd Graham, Paul Johnson, and Russ Poptanycz ("Plaintiffs") appeal the 12(b)(6) dismissal of their putative class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, alleging that Defendants-Appellees—plan fiduciaries of the Eaton Corporation employee stock ownership plan ("Defendants")—breached their fiduciary duties by failing to protect the plan from harm caused by the artificial inflation of Eaton's stock price due to an alleged fraud and misrepresentation by Eaton executives. We **AFFIRM**.

I.

Because Plaintiffs appeal from dismissal under Rule 12(b)(6), the facts set forth below, pleaded in Plaintiffs' Complaint, are accepted as true and in the light most favorable to Plaintiffs. *See Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Eaton is a publicly traded company that manufactures products in the industrial, agricultural, aerospace, and vehicle markets. Eaton sponsors a defined contribution plan ("the Plan") for eligible employees, who are permitted to defer up to fifty percent of their compensation into the Plan. Plan participants may elect to direct their investments into a number of investment options, including stock and bond mutual funds with various target date maturities. One investment option is the Eaton Company Stock Fund ("the Fund"), an employee stock ownership plan ("ESOP") that invests primarily in Eaton common stock. From November 13, 2013 through July 28, 2014 (the "Class Period"), Plan participants purchased approximately $40 million dollars' worth of Eaton Stock through the ESOP, adding to the $909 million already held.

Plaintiffs are former Eaton employees currently enrolled in the Plan who invested in the Fund during the Class Period. Defendants[1] were at relevant times senior Eaton corporate officers, members of the Plan's Pension Investment Committee, members of the Plan's Pension Administrative Committee, and/or "Named Fiduciaries" of the Plan under the governing documents. In this appeal, it is uncontroverted that Defendants were fiduciaries of the Plan.

Historically, Eaton was headquartered in Cleveland, Ohio and its primary business was manufacturing vehicle components. Since 2008, Eaton "has been making strategic shifts away from its vehicle business while growing its electrical component business." [Complaint, R.1 at PID 5]. In 2012, Eaton acquired Cooper Industries Plc ("Cooper"), an Ireland-based electrical product manufacturer, for $11.8 billion. Eaton accomplished the acquisition "through the formation of a new Irish holding company resulting in Eaton's reincorporation in Ireland and the

---

[1] Defendants-Appellees are Eaton's Chief Financial Officer Richard Fearon, Chief Accounting Officer Ken Semelsberger, Treasurer Trent Meyerhoefer, and former General Counsel Mark McGuire.

re-domiciling of its headquarters . . . to Dublin, Ireland—a change that purportedly allowed Eaton to lower its corporate tax rate." [*Id.*].

Following the Cooper acquisition, analysts speculated whether the transaction would "prevent Eaton from engaging in a lucrative spin-off of its vehicle business."[2] [*Id.* at PID 19]. Several Eaton executives, including Defendant Fearon ("Fearon"), fielded questions about Eaton's ability and potential plans for such a spin-off. First, on May 21, 2012, during an investor call discussing the Cooper merger, an analyst asked Eaton CEO Alexander Cutler[3] if Eaton was "precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time?" [*Id.*]. Cutler responded: "There is nothing in the deal per se that would prevent us from taking portfolio moves, but we have no such plans." [*Id.*].

During another investor call on October 31, 2012, an analyst asked Cutler the following: "In 2013 is there anything from a regulatory basis vis-à-vis, I guess, the acquisition of Cooper that would prevent you from doing additional divestitures if you wanted to?" [*Id.*]. Cutler responded: "No. There wouldn't be any—no regulatory restrictions." [*Id.*]. On November 13, 2012, Cutler fielded similar questions at the Goldman Sachs Industrial Conference, answering: "[T]here is nothing structural in our deal structure or any of our covenants that . . . prevents us

---

[2] "A spin-off is a type of divestiture that involves a parent company distributing shares of its subsidiary to shareholders on a pro rata basis. Unlike most corporate divestitures such as subsidiary stock sales and asset sales, spin-offs often qualify as tax-free events." [R.1 at PID 19].

[3] Cutler is not named as a Defendant in Plaintiffs' Complaint. A separate case, *In re Eaton Corp. Sec. Litig.*, No. 16-CV-5894, 2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017), alleged Cutler and Fearon violated the Securities Exchange Act. The district court granted a motion to dismiss, finding that none of the alleged misstatements are actionable because, *inter alia*, "the defendants were under no duty to disclose the hypothetical tax consequences of a potential spin-off of Eaton's automotive business because the defendants themselves repeatedly made clear that the 'indicated probability' of such a spin-off was zero." *Id.* at *8 (quoting *Castellano* v. *Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir. 2001)).

from making changes in our portfolio . . ." [*Id.* at PID 20]. Plaintiffs-Appellants allege "[a]s time passed, analysts began to anticipate that Eaton was nearing a spin-off of its vehicle business." [*Id.* at PID 21]. One analyst asserted: "We [] believe a spin-off or sale of the [Eaton] Vehicle segment is possible over the next 12-18 months and could be a positive catalyst for the stock." [*Id.*].

On November 13, 2013—the first day of the Class Period, with Eaton's stock price at $72.45 per share—Fearon was asked whether Eaton was considering divesting its vehicle business and whether it viewed the vehicle business as a "sacred cow." He replied:

> In terms of your second question about vehicle, is it a sacred cow? Well, first of all, I'd say nothing is a sacred cow. You have seen us over the last 15 years make pretty major portfolio shifts. We have sold or spun businesses that had roughly $1.5 billion of revenues. We've bought businesses that had $12 billion of revenues. And so we have [] made major changes. We have a systematic process of looking at where those kinds of actions would benefit us and a process, particularly on the acquisition side, of keeping our hand in various situations so that when the opportunity naturally arises for a transaction, we can act. . . . [W]e are continuing those processes. If we believe that a business is better owned by somebody else, we will not be afraid to act on that, but at this juncture we really think that the structure of the portfolio works.

[*Id.*]; [R. 25-5 at PID 205].

During an earnings call with investors on July 29, 2014—the last day of the Class Period—Cutler stated that Eaton was subject to a five-year restriction on tax-free spin-offs as a result of the Cooper merger: "[W]e also wanted to clarify that we are not able to do a tax-free spin[-off] of any business for five years. . . . any spin would result in a very significant tax liability" and "this five year kind of prohibition . . . means that there is not really a compelling economic rationale for further business portfolio transaction[s]." [*Id.* at PID 23]. Fearon added: "Because of the legal steps we had to do to complete the transaction for Cooper, there are a

couple of code sections that make it not possible to do a tax free spin for five years." [*Id.*].

Cutler also said: "[I]t's not new knowledge. We've been aware of this all along." [*Id.*].

That day, Eaton share prices dropped 8.13 percent, or $6.24 per share, to close at $70.51.

Eaton's stock fell further to $61 per share in the following months. [*Id.*].

## II.

Plaintiffs brought a putative class action pursuant to ERISA Section 502, 29 U.S.C.

§ 1132, alleging one count of breach of fiduciary duty:

> Eaton's fraud and misrepresentation to investors about the feasibility of tax-free spin-offs caused its stock price to trade at artificially inflated prices. The Plan participants who purchased the Eaton Stock Fund during this time purchased an imprudent investment and were damaged by over-paying for this stock.

[*Id.* at PID 23]. Plaintiffs admit that Eaton executives denied that Eaton had current plans to spin-off its vehicle business, but argue that in the absence of accurate information about the tax consequences of a spin-off, "[a]ny reasonable person . . . would be hard pressed not to believe that Eaton was at least contemplating a spin-off of the vehicle business." [Appellants' Br. at 9]. Plaintiffs allege Defendants failed to prudently manage the Plan's assets when they took no action "to protect the retirement savings of the Plan participants to whom they owed fiduciary duties from harm as the result of the undisclosed fraud and inflation of Eaton's stock prices." [*Id.* at PID 25]. Plaintiffs allege Defendants could have: (1) halted new contributions or investments in the Fund; (2) issued corrective disclosures to cure the fraud in a timely fashion; or (3) directed the Fund to divert a portion of its holdings into a low-cost hedging product to offset some of the losses. [*Id.* at PID 8–9] (citing *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014)).

Defendants moved to dismiss the complaint for failure to meet the pleading standards required of claims against ESOP fiduciaries. Plaintiffs opposed the motion and alternatively

asked that any dismissal be without prejudice so as to allow an amended complaint. Finding

Plaintiffs failed to state a plausible claim, the district court granted the motion to dismiss. It also

denied Plaintiffs' request for an opportunity to amend the complaint.

III.

We review the district court's dismissal of a complaint for failure to state a claim de

novo. *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 858 (6th Cir. 2017) (citing *Bennett v. MIS

Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010)). We must "accept all well-pleaded factual

allegations as true and construe the complaint in the light most favorable to plaintiffs." *Id.*

(citation omitted). "[A] well-pleaded complaint may proceed even if it appears that a recovery is

very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

We generally review a district court's denial of leave to amend for abuse of discretion*,

Miller v. Champion Enters., Inc.*, 346 F.3d 660, 671 (6th Cir. 2003), except that we review de

novo if the district court bases its decision on the legal conclusion that an amended complaint

could not withstand a motion to dismiss. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1188

(6th Cir. 1996). "[A] bare request in an opposition to a motion to dismiss—without any

indication of the particular grounds on which amendment is sought—does not constitute a

motion within the contemplation of Rule 15(a)." *Beydoun v. Sessions*, 871 F.3d 459, 469–70

(6th Cir. 2017) (citation omitted). In those situations, "there was no motion to deny, and

accordingly, [this court] review[s] the district court's actions for abuse of discretion." *Id.* at 470

(citing *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 485 (6th Cir. 2010))

(internal quotation marks omitted).

IV.

ERISA fiduciary standards arise from 29 U.S.C. § 1104, which prescribes four duties owed to participants: (1) the duty of loyalty, 29 U.S.C. § 1104(a)(1); (2) the duty to act prudently "under the circumstances then prevailing," *id.* at § 1104(a)(1)(B); (3) the duty to diversify plan assets, *id.* at § 1104(a)(1)(C); and (4) the duty to follow the plan's terms, *id.* at § 1104(a)(1)(D). The duties are slightly altered with respect to ESOPs. Because an ESOP invests primarily in the stock of the company that employs its participants, the duty to diversify is inapplicable. 29 U.S.C. § 1104(a)(2).

Prior to 2014, most courts applied a presumption that fiduciaries of ESOPs act prudently when investing in company stock. *See, e.g.*, *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 591 (6th Cir. 2012), abrogated by *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459 (2014). However, in *Fifth Third*, the Supreme Court rejected that presumption and held that ERISA fiduciaries are "subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets." 134 S.Ct. at 2463. Nevertheless, because "ESOP fiduciaries confront unique challenges given 'the potential for conflict' that arises when fiduciaries are alleged to have imprudently 'failed to act on inside information they had about the value of the employer's stock,'" the Court "laid out standards to help 'divide the plausible sheep from the meritless goats.'" *Amgen Inc. v. Harris*, 136 S. Ct. 758, 759 (2016) (quoting *Fifth Third*, 134 S.Ct. at 2470). The Court explained:

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Fifth Third*, 134 S.Ct. at 2472.

Applying *Fifth Third*, the Ninth Circuit considered a claim that ESOP fiduciaries withheld non-public information that resulted in overvaluation of the employer's stock. *Harris v. Amgen, Inc.*, 788 F.3d 916, 929–933 (9th Cir. 2014). The court held the plaintiffs stated a claim by sufficiently alleging an alternative:

> Removal of the Fund as an investment option might cause a drop in the share price, perhaps slightly more than the amount of any initial artificial inflation. . . . [E]ven if the drop in stock price does not cause these fiduciaries to [disclose], removal of the Fund as an investment option will prevent the greater harm to plan participants that would result if no disclosure is made, if the stock price continues to inflate artificially, and if plan participants are allowed to make continued investments in the Fund at increasingly inflated prices. In other words, it is quite plausible that in this situation, too, defendants could remove the Fund as an investment option without causing undue harm to plan participants.

*Id.* at 938.

The Supreme Court summarily reversed, explaining that the court "failed to assess whether the complaint in its current form 'has plausibly alleged' that a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.'" *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (quoting *Fifth Third*, 134 S.Ct. at 2463). The Court was clear that plaintiffs' proposed action—removing the ESOP fund from investment options—"could plausibly have satisfied *Fifth Third*'s standard," but reversed and remanded because the complaint did not contain sufficient facts and allegations to satisfy that standard. *Id.*

This court and several of our sister circuits have considered the pleading standards for suits alleging an ESOP-related breach of fiduciary duty in light of *Fifth Third* and *Amgen*. *See, e.g.*, *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855 (6th Cir. 2017); *Coburn v. Evercore Trust Co.*, 844 F.3d 965 (D.C. Cir. 2016); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56 (2d Cir. 2016); *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016).

In *Saumer*, the plaintiffs alleged that, based on "inside information" that a particular mine would not deliver the promised profits, prudent fiduciaries knew or should have known the company stock was overvalued. *Id.* at 863. The complaint alleged fiduciaries should have prevented ESOP losses by: (1) disclosing "inside information about the mine so that the market would correct downward and the fiduciary would cease buying [company] stock at an inflated price"; (2) holding new contributions to the ESOP fund in cash; or (3) "clos[ing] the Company Stock itself to further contributions and direct[ing] that contributions be diverted from Company Stock into other (prudent) investment options." *Id.* (alterations in original). We rejected plaintiffs' argument:

> [T]he complaint fails to plausibly allege that a prudent fiduciary could not have concluded that stopping purchases or publicly disclosing negative information would do more harm than good. [The] fiduciaries could have concluded that divulging inside information about the [mine] would have collapsed [the company's] stock price, hurting participants already invested in the ESOP. And closing the fund without explanation might be even worse: It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value.

*Id.* at 864 (internal citations, alterations, and quotation marks omitted).

V.

In the instant case, Plaintiffs allege Defendants breached their fiduciary duties "when Eaton's stock became artificially inflated in value due to fraud and misrepresentation (in which several of the Defendants participated), which made the Eaton stock fund . . . an imprudent investment." [R.1 at PID 3]. Plaintiffs argue Defendants could have prevented "or at least mitigate[d] any damage caused by the fraud to the Plan" by: (1) "effectuat[ing] corrective, public disclosures to cure the fraud"; (2) "temporarily closing or freezing the Eaton Stock Fund . . . until such time as Eaton stock again became a prudent investment"; or (3) "divert[ing] some of Eaton Stock Fund's holdings into a low-cost hedging product." [*Id.* at PID 3–4].

Applying *Fifth Third's* pleading standard to the facts alleged in Plaintiffs' Complaint, we conclude that the district court properly determined the Complaint does not propose an alternative course of action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it.

A.

First, Plaintiffs contend Defendants "should have issued truthful or corrective disclosures to cure the fraud and to make its stock a prudent investment again for the Plan." [R.1 at PID 26]. This court and all other courts considering that alternative action post-*Fifth Third* have rejected it. *See, e.g.*, *Saumer*, 853 F.3d at 864; *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (affirming a dismissal because the plaintiffs' complaint did not "plausibly plead facts and allegations showing that a prudent fiduciary during the class period 'would not have viewed [disclosure of material nonpublic information regarding Lehman . . . ] as more likely to harm the fund than to help it'") (quoting *Amgen*, 136 S.Ct. at 759)); *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016) ("[I]t does not seem reasonable to say that a prudent fiduciary at that time could not have concluded that [] disclosure of such information to the public . . . —[] which would likely lower the stock price—would do more harm than good. In fact, it seems that a prudent fiduciary could very easily conclude that such actions *would* do more harm than good.") (emphasis in original).

The only specific allegation regarding the "more harm than good" test as applied to Plaintiffs' disclosure alternative is that "the longer a securities fraud goes on, the more harm it causes to shareholders." [Appellants' Br. at 25]. The United States filed an amicus brief in *Fifth Third* arguing the same point:

> Petitioners argue that public disclosure would decrease the value of the assets already held by the plan. That would be true if the price has been artificially inflated by the company's public misrepresentations. But if so, a similar or greater drop might well occur if correction of the misrepresentations were delayed – potentially months or years later, after even more of the employees' retirement savings have been invested in the overpriced assets. It better serves the interests of the plan participants if the fiduciaries take immediate actions to bring the price of the stock in line with its true value by disclosing the material nonpublic information.

Brief for the United States as Amicus Curiae Supporting Respondents, *Fifth Third Bancorp v. Dudenhoeffer*, 2014 WL 880926, *28–*29. The Supreme Court rejected that argument, albeit implicitly, when it vacated and remanded the lower court's decision to deny the motion to dismiss. More explicitly, the Court's guidance to lower courts contemplates that argument:

> [L]ower courts faced with such claims should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that . . . publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

*Fifth Third*, 134 S. Ct. at 2473.

Here, Plaintiffs do not plausibly allege that disclosing the tax consequences of the Cooper merger was so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it. Plaintiffs' argument does not account for the risk of market overreaction to such a disclosure, resulting in a decline worse than actually warranted. Nor does Plaintiffs' proposal factor in the potential harm to ESOP participants planning to sell their Eaton stock during the class period.

Plaintiffs stress that the stock price continued to fall in the months following the disclosure, which they argue "is evidence of the reputational penalty that Eaton suffered by

prolonging its fraud."[4] [Appellants' Br. at 28]. Plaintiffs contend this fact distinguishes their allegations from previous cases. *But see* Brief of Plaintiffs-Appellants, *Saumer v, Cliffs Natural Resources, Inc.*, 2016 WL 5871410 (C.A.6), *26. However, recognizing ERISA imposes the duty to act in a prudent manner "under the circumstances then prevailing," courts have noted the "duty . . . requires prudence, not prescience." *Rinehart*, 817 F.3d at 64 (citation omitted).

Both Cutler and Fearon repeatedly stated that Eaton had no plans to spin off its vehicle business, so a reasonably prudent fiduciary may have determined that disclosing the tax consequences of such unplanned actions would do more harm than good. Fearon told investors that "nothing is a sacred cow," and implied that Eaton could spin off any component, but he immediately qualified that "at this juncture we really think that the structure of the [Eaton] portfolio works." [R. 25-5 at PID 205]. Although earlier disclosure *may* have ameliorated some harm to the Fund, that course of action was not so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it.

B.

Next, Plaintiffs suggest Defendants could have mitigated harm to the Plan "by halt[ing] all new contributions or investments into the Eaton Stock Fund while it knew that it was an imprudent investment because its stock price was inflated due to fraud and undisclosed material information." [R.1 at PID 31]. The district court rejected this alternative commenting that "halting investment in a company fund can cause the market to infer that 'insider fiduciaries view[] the employer's stock as a bad investment,' resulting in a drop in stock price." [R. 29 at PID 537].

---

[4] Before Plaintiffs filed their Complaint, the stock price had fully rebounded.

The plaintiffs in *Amgen* made the same argument Plaintiffs advance here and the Ninth Circuit agreed, holding that where a company withheld material information, "the impact of the eventual disclosure of that information must be taken into account in assessing the net harm that will result from the withdrawal of the fund." *Harris v. Amgen, Inc.*, 788 F.3d 916, 920 (9th Cir. 2015). In such a case, "it is plausible to conclude that the withdrawal of the fund will result in a net benefit, rather than a net harm, to plan participants." *Id.* However, the Supreme Court found this insufficient to meet the *Fifth Third* standard and reversed. *Amgen*, 136 S. Ct. at 760 (citing *Fifth Third*, 134 S. Ct. at 2463).

In *Saumer*, we explained why halting investments without explanation could be "even worse" for Plan participants than disclosure: "It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value." *Saumer*, 853 F.3d at 864 (quoting *Amgen*, 788 F.3d at 925–26 (Kozinski, J., dissenting from denial of reh'g en banc)).

Attempting to distinguish this case from *Saumer*, Plaintiffs-Appellants argue that "a prolonged fraud causes greater reputational damage and thus is less likely to eventuate in a rebound." [Appellants' Br. at 28–29]. However, this does not establish that halting stock purchases was so clearly beneficial that a prudent fiduciary, under the circumstances, could not conclude that it would be more likely to harm the fund than to help it.

C.

Finally, Plaintiffs suggest Defendants could have "direct[ed] the Eaton Stock Fund to put a small but significant portion of its holdings into a low-cost hedging product." [R.1 at PID 34]. Such products "are not derivatives, and therefore their purchase need not be disclosed under the securities laws." [*Id.*]. The district court rejected this alternative, noting it "suggests that

Defendants had a duty to diversify the Fund's holdings." [R. 29 at PID 539]. The district court also found "Plaintiffs' failure to identify what hedging product Defendants should have invested in—whether it was a short position in Eaton stock, an insurance product, or something else— dooms their claim." [*Id.*].

On appeal, Plaintiffs add no further detail to the kind of low-cost hedging product they envision except to note that it would not be a short position in Eaton stock, because that would be derivative. [Appellants' Br. at 30–31]. Plaintiffs argue that its description—"a low-cost product that trades counter to Eaton stock and that is not a derivative"—should be treated as a true factual allegation at this stage. [*Id.*]. Plaintiffs do not address the district court's finding that this alternative imposes a duty to diversity.

Even if this alternative would not impose a duty to diversify from which ESOP fiduciaries are exempt, 29 U.S.C. § 1104(a)(2), the district court was required to conduct "careful, context-sensitive scrutiny of a complaint's allegations" to determine whether the "complaint states a claim that the fiduciaries acted imprudently." *Fifth Third*, 134 S. Ct. 2459, 2470, 2471. The district court—and this court—cannot do so without specific factual allegations supporting Plaintiffs' proposed alternative course of action.

Finally, Plaintiffs argue it would make little sense for the Supreme Court to reject a presumption of prudence in *Fifth Third* only to impose a standard that virtually forecloses all similar actions in the future. [Appellants' Br. at 23]. We recognize that the *Fifth Third* standard is difficult for plaintiffs to meet and that no court since *Amgen* has found sufficiently pled alternative actions. Nevertheless, under the particular facts of this case, none of Plaintiffs' proposed alternatives was so clearly beneficial that a prudent fiduciary, under then prevailing circumstances, could not conclude that it would be more likely to harm the fund than to help it.

VI.

Plaintiffs also appeal the district court's denial of leave to amend. Under Fed. R. Civ. P. 15(a)(2), "leave to amend shall be freely given when justice so requires." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (citing *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010). However, "implicit in [Rule 15(a)] is that the district court must be able to determine whether 'justice so requires,' and in order to do this, the court must have before it the substance of the proposed amendment." *Id.* (citing *Roskam Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002)).

In *Beydoun*, the plaintiff's failure to "submit[] . . . the facts to aid the court in deciding whether justice required the court to grant leave to amend" was fatal to the motion. *Id.* at 469–70 (internal citations and quotation marks omitted). There, the plaintiff made an oral motion seeking leave to amend if the district court were inclined to grant the defendant's motion to dismiss. *Id.* at 70. The plaintiff never informed the district court of what facts he could allege to supplement his claim in order to survive a successive motion to dismiss. *Id.* Under those circumstances, we found the district court did not abuse its discretion in denying the plaintiff's "unsupported motion." *Id.*

Here, on the penultimate page of Plaintiffs' Suggestions in Opposition to Defendants' motion to dismiss, Plaintiffs stated: "[I]f the Court does grant the motion, plaintiffs respectfully request that it do so without prejudice so that plaintiffs may file an amended complaint curing the defects in its original pleading." [R. 27 at PID 504]. Plaintiffs did not state what facts they would allege to cure any potential deficiencies, but argued that:

> The law regarding breach of fiduciary duty claims brought under ERISA . . . is evolving all the time. While plaintiffs believe they have adequately satisfied the demands of *Dudenhoeffer*'s pleading standard, in light of the tremendous uncertainty that still haunts this area of law, fairness suggests that plaintiffs

should be afforded at least one opportunity to correct any deficiencies in meeting this pleading standard . . . .

[*Id.*].

The district court denied the motion, finding "[s]uch a perfunctory request, inserted at the end of an opposition brief, without giving the Court any reason to believe that an amended complaint would be anything other than futile, is improper."  [R. 29 at PID 540] (citation omitted).

Rule 15 instructs courts to "freely give leave" to amend, *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014), and the district court certainly had discretion to grant Plaintiffs' request.  However, Plaintiffs are not entitled to a directive from the district court "informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies."  [R. 29 at PID 541] (quoting *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000); *see also Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010).  Under these circumstances, because Plaintiffs' request was perfunctory and did not point to any additional factual allegations that would cure the complaint, the district court did not abuse its discretion in denying a motion to amend.

VII.

For the foregoing reasons, we **AFFIRM**.